IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 5:18CR765 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM E. CALLAM, | ) | <u>UNITED STATES' SENTENCING MEMORANDUM</u> |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its counsel, Justin E. Herdman, United States Attorney, and Megan R. Miller, Assistant United States Attorney, respectfully submits this memorandum setting forth the United States' position regarding the sentencing for Defendant William E. Callam. For the reasons set forth below and those to be articulated at the sentencing hearing, the United States respectfully submits that a sentence within the Guidelines range set forth in the PSR and the parties' Plea Agreement is appropriate in this case.

**I.      FACTUAL BACKGROUND**

To support its sentencing position, the United States offers the following summary of Defendant Callam's conduct. The United States also refers the Court to the description included in the PSR. (R. 12: PSR, PageID 63-66).

Over the course of five years, Defendant Callam orchestrated a scheme to defraud victims B.Q., D.Q. and C.B. out of hundreds of thousands of dollars that they had saved for their retirement. Callam, knowing that the victims trusted him and considered him their financial advisor, advised the victims to liquidate multiple annuities and insurance policies and to invest those funds into a company called Blackstone Real Estate Group LLC ("Blackstone"). Callam told the investors that Blackstone was in the business of financing loans for the purchase and rehabilitation of commercial real property, which loans were purportedly secured by mortgages on the real property. To induce the victims to invest in Blackstone, Callam falsely represented that their principal investment would yield a guaranteed 6% rate of return and that investments in Blackstone were "safe" and "liquid."

Unbeknownst to the victims, however, Blackstone—which Callam solely owned and controlled—was not a legitimate investment. Rather, Callam used the investor funds to enrich himself and maintain his own personal lifestyle, which included substantial cash withdrawals, credit card payments, and gambling. When B.Q. and D.Q. asked Callam about their investment, Callam provided false investment statements that reflected fictitious earnings to reassure the victims that their money was safe. He also forged two mortgage notes as evidence of the security of Blackstone, knowing that the property purportedly secured by the mortgage belonged to a third party. In total, Callam stole over $500,000.

## II. APPLICABLE LEGAL STANDARDS

A well-established legal framework guides the Court's sentencing determination. The advisory Guidelines range serves as "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also United States v. Collington*, 461 F.3d 805, 807 (6th Cir. 2006). The Guidelines thus remain an indispensable resource for assuring appropriate

and uniform punishment for federal criminal offenses. The Sentencing "Commission fills an important institutional role: It has the capacity courts lack to 'base its determination on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (internal citation omitted). After determining the appropriate Guidelines range, the Court then turns to the familiar factors set forth in 18 U.S.C. § 3553(a).

### III. <u>SENTENCING GUIDELINES COMPUTATION</u>

The United States concurs with the Guidelines calculations set forth in the PSR. (R. 12: PSR, PageID 69). Callam's base offense level is 7 under U.S.S.G. § 2B1.1(a)(1). A fourteen-level enhancement applies under § 2B1.1(b)(1)(H) because Callam caused loss between $500,000 and $1,500,000. A two-level enhancement also applies under U.S.S.G. § 2B1.1(b)(2)(A)(iii) because Callam's conduct resulted in substantial financial hardship to at least one of his victims. An additional two-level enhancement applies under § 3B1.3 because Callam abused a position of trust in the commission of the crime. After a three-level reduction for acceptance of responsibility, Callam's total offense level is 22. Callam falls into Criminal History Category IV. At an offense level 22 and a Criminal History Category IV, Callam's advisory Guidelines range is 63 to 78 months.

### IV. <u>APPLICATION OF § 3553(a) FACTORS</u>

#### A. <u>NATURE AND CIRCUMSTANCES OF OFFENSE</u>

The nature and circumstances of the offense counsel in favor of a sentence within the Guidelines range contemplated in the parties' Plea Agreement. As evidenced by the Victim Impact Statements submitted to the Court, Callam's fraud had, and continues to have, devastating consequences for his victims—financially, physically and emotionally. Callam

convinced his victims to liquidate all or substantially all of their retirement assets. Robbed of their financial security, Callam's victims are struggling to support themselves. For B.Q. and D.Q., the liquidation of their IRA accounts caused additional adverse tax consequences. They also cannot pay for D.Q.'s medical care and cannot afford a necessary new vehicle. For C.B., the loss of her savings means that she cannot afford her prescription medications and must choose what bills to pay each month. In addition to the financial fraud, the victims all experienced mental and emotional anguish as a result of Callam's actions. Indeed, C.B. "was devastated financially and emotionally" and B.Q. and D.Q. stated that they "have almost died over this."

While Callam's fraud itself is significant, what makes his conduct more egregious is his abuse of the victims' trust. This was not a situation in which the victims were defrauded at random by an unknown perpetrator. To the contrary, Callam intentionally targeted the victims because they were elderly and trusted him. As C.B. explained: "I trusted him completely and considered him a close friend." And to B.Q. and D.Q., Callam's fraud was "a betrayal." Callam not only relied on his victims' trust at the outset to obtain their money, he also used it for years thereafter to lull them into a false sense of security, repeatedly reassuring them that their investments were "safe." The duration and manner of Callam's fraud coupled with its substantial impact on his victims thus counsel in favor of a sentence within the Guidelines range set forth in the parties' Plea Agreement.

  B. <u>HISTORY AND CHARACTERISTICS OF THE DEFENDANT</u>

Callam has a significant and concerning history of similar criminal conduct. In June of 2007, Callam was convicted of theft for defrauding two senior citizens out of over $68,000, misrepresenting that he was part of an organization to aid senior citizens and promising to invest

4

their money in annuities. (R. 12: PSR, PageID 70-71). Later that year, he was again convicted of theft for defrauding four other individuals of $49,000, taking funds presented to him as payment for annuities and diverting them to his own use. (*Id.*, PageID 71). Despite being sentenced to five years of community control for these offenses, Callam embarked on the instant scheme to defraud B.Q., D.Q. and C.B. in 2013. While that scheme was ongoing, he was convicted in 2015 of attempting to secure writings by deception. (*Id.*, PageID 72). In that case, Callam defrauded the victim of $55,000 by misrepresenting himself as an insurance agent who was certified to sell annuities with a guaranteed 3% rate of return. (*Id.*).

This similar pattern of criminal activity—wherein Callam abuses his position of trust to take advantage of elderly investors—suggests a general disregard both for the law and for the rights of others. That Callam has had multiple opportunities to correct his behavior yet continues to engage in similar conduct highlights his high risk of recidivism and makes clear that previous judicial sanctions have had little deterrent effect on him. Indeed, Callam was on community control during the height of the instant investment scheme, which further demonstrates his disrespect for the law and the need to protect the public from his pervasive criminal behavior. As such, Callam's history and personal characteristics indicate that a sentence within the Guidelines range is appropriate.

V.     **RESTITUTION**

Restitution to the victims is directed by the Guidelines and mandated by law. *See* U.S.S.G. § 5E1.1; 18 U.S.C. § 3663A. Thus, the United States requests that the Court order Callam to pay restitution in the amount of $192,575.00 to C.B. and in the amount of $381,571.47 to D.Q. and B.Q.

## VI.  CONCLUSION

The offense conduct and other relevant factors fall within the scope of circumstances contemplated by the Guidelines, and a Guideline sentence thus will accomplish the goals of 18 U.S.C. § 3553(a).  For these reasons and those to be articulated at the sentencing hearing, the United States respectfully requests that the Court impose a term of imprisonment within the Guidelines range set forth in the PSR and the parties' Plea Agreement.

>                     Respectfully submitted,
>
>                     JUSTIN E. HERDMAN
>                     United States Attorney
>
> By:  /s/ Megan R. Miller
>      Megan R. Miller (OH: 0085522)
>      Assistant United States Attorney
>      United States Court House
>      801 West Superior Avenue, Suite 400
>      Cleveland, OH 44113
>      (216) 622-3855
>      (216) 522-8355 (facsimile)
>      Megan.R.Miller@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of May 2019 a copy of the foregoing document was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

/s/ Megan R. Miller
Megan R. Miller
Assistant U.S. Attorney